IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| CHRISTOPHER G. HURN and JULREI ENTERPRISES LLC | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO.: 1:25-cv-06840-MLB |
| COMMUNITY BANKSHARES, INC., COMMUNITY BANK & TRUST – WEST GEORGIA, PHOENIX LENDER SERVICES, LLC, and THOMAS FINANCIAL GROUP, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | **JURY TRIAL DEMANDED** |

## VERIFIED AMENDED COMPLAINT

Plaintiffs Christopher G. Hurn ("Hurn") and JulRei Enterprises LLC ("JulRei," and together with Hurn, "Plaintiffs"), by and through his undersigned counsel, files this Verified Amended Complaint against Defendants Community Bankshares, Inc. ("CBI"), Community Bank & Trust – West Georgia ("CB&T"), Phoenix Lender Services, LLC ("Phoenix"), and Thomas Financial Group, Inc. ("TFG") (collectively the "Defendants"), and hereby respectfully shows the Court as follows:

## SUMMARY OF CASE

1.     This action arises from Defendants' calculated course of conduct to induce JulRei and Hurn, a nationally recognized government guaranteed (SBA and USDA) lending executive, to rebuild, capitalize, and lead their once-struggling financial enterprise, only to wrongfully oust him after he created substantial value for them.

2.     In reliance on Defendants' repeated promises of partnership, equity participation, and long-term leadership, Plaintiffs contributed not only their professional reputation, network and team, but also two million dollars ($2,000,000) in personal capital through an eight hundred thousand dollar ($800,000) loan and one million two hundred thousand dollar ($1,200,000) equity investment, as well as more than nine (9) months of uncompensated executive labor to transform Defendants' business into a profitable, nationally prominent lending platform.

3.     Through Plaintiffs' leadership, Defendants' consolidated assets nearly tripled, their profitability and national reputation dramatically improved, and the Phoenix Lender Services platform in which he was instrumental in conceiving and leading, was independently valued at more than eighty-five million dollars ($85,000,000) as of June 30, 2025.

2

4.      Rather than honor the contractual, fiduciary, and equitable obligations arising from these contributions, Defendants deprived Plaintiffs of promised conversion and equity rights, refused to pay earned compensation and bonuses, and publicly issued a false and defamatory statement claiming that he had "resigned effective immediately" as a result of "necessary corrective actions."

5.      Defendants' conduct constitutes breaches of written agreements, breaches of the implied covenant of good faith and fair dealing, unjust enrichment, quantum meruit, fraudulent inducement, and other tortious and wrongful acts for which Plaintiffs now seek redress.

6.      Plaintiffs brings this action to recover the value of the unpaid compensation, loan proceeds, and equity interests; to obtain declaratory and injunctive relief confirming their rights and Defendants' obligations; to impose a constructive trust over the Phoenix assets and revenues derived from their work; and to obtain compensatory, consequential and punitive damages for the harm Defendants have caused to him and to the enterprise he built.

## PARTIES

7.      Plaintiff Hurn is a natural person and a resident of Puerto Rico, having an address of 7000 Bahia Beach Boulevard, ODR 5301, Rio Grande, Puerto Rico 00745. At all times material hereto, Plaintiff was engaged by and served in an

3

executive role of Defendants' affiliated entities pursuant to written consulting and management agreements governed by Georgia law.

8.     Plaintiff JulRei is a Puerto Rico limited liability company with its principal place of business located at 7000 Bahia Beach Boulevard, ODR 5301, Rio Grande, Puerto Rico, 00745.  Plaintiff Hurn is the sole Member and Manager of JulRei.

9.     Defendant CBI is a Georgia corporation with its principal place of business at 201 Broad Street, LaGrange, Georgia 30240. CBI is a registered bank holding company that, at all times material hereto, owned and controlled the other Defendant entities named herein. CBI may be served with process through its registered agent for service on file with the Georgia Secretary of State.

10.    Defendant CB&T is a Georgia-chartered commercial bank and wholly owned subsidiary of CBI, with its principal offices located at 201 Broad Street, LaGrange, GA, 30240. CB&T may be served with process through its registered agent or through an officer at its principal place of business.

11.    Defendant Phoenix is a Georgia limited liability company formed and operated as a government-guaranteed lender-services platform under CBI's control. Phoenix's principal office is listed as 201 Broad Street, LaGrange, MT, 30241 (sic), though the correct state designation appears to be Georgia (GA). Phoenix

4

may be served with process through its registered agent or managing member on record with the Georgia Secretary of State.

12.    Defendant TFG is a Georgia corporation and wholly owned subsidiary of CBI engaged in government-guaranteed and specialty-finance activities. TFG's principal office is located at 3060 Peachtree Road, NW, Suite 1855, Atlanta, Georgia 30305. TFG may be served with process through its registered agent on file with the Georgia Secretary of State or through an executive officer at its principal place of business.

13.    Defendants CBI and Phoenix are together referred to herein as the "Contracting Defendants."

JURISDICTION AND VENUE

14.    This Court has original jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332.  Subject matter jurisdiction is proper because the amount in controversy exceeds $75,000, exclusive of interest and cost, and there is complete diversity of citizenship as the named Plaintiffs and each of the Defendants are citizens of different states.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.    This Court has personal jurisdiction over each defendant named herein because each defendant is a corporation organized under Georgia law or that

conducts business in and maintains operations in this District and conducts continuous and systematic business in Georgia, thereby purposefully availing themselves to the privileges of conducting business in this State, and because the acts and omissions contained in this Complaint occurred in Georgia.

16.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) because each of the Defendants is a resident of Georgia; at least one each of Defendants is headquartered in this District; and a substantial portion of the transactions and wrongs complained of herein occurred in this jurisdiction.

FACTUAL ALLEGATIONS

17.    Plaintiff Hurn is a nationally known government-guaranteed (SBA and USDA) lending executive who, beginning in 2023, was recruited by the leadership of CBI to rebuild, professionalize, capitalize, and scale CBI and its related lending and lender-services businesses.

18.    Defendant CBI is a Georgia bank holding company. Its principal banking subsidiary is Defendant CB&T. CBI also controls and operates Defendants Phoenix and TFG.

19.    Before Plaintiffs' involvement, CBI and its subsidiary were financially and operationally distressed. CBI's principal bank asset was a small, rural institution, operating under a longstanding regulatory consent order.

6

20.    CBI's total assets at that time, according to the bank's Quarter 3 2023 Call Report were approximately one hundred six million dollars ($106,000,000) in total assets, limited product offerings, and legacy personnel still operating under a twelve (12) year regulatory consent order.

21.    In or around June 2023, CBI leadership, including current senior executives, approached Plaintiff Hurn with a proposal: (a) consolidate and bring his team to CBI; (b) assume a senior leadership role within CBI; (c) become the effective "number two" executive within the organization; and (d) act as the designated successor and long-term partner to the current leadership.

22.    The assurances made to Plaintiffs were material to their recruitment.

23.    Pursuant to this proposal, Plaintiffs coordinated a phased migration of his highly experienced team to CBI, CB&T and the entity which would eventually become Phoenix between mid-2023 and January 2024.

24.    By January 2024, approximately ninety-five percent (95%) of Plaintiffs' former employees had been placed across CBI, CB&T, and at the entity which would eventually become Phoenix.

25.    In February 2024, prior to being a contracted employee, Plaintiff Hurn was informally named and being marketed as the "President of SBA Lending" for CBI, as represented on his corporate approved business cards.

26.     From approximately August 2023 through April 2024, Plaintiff Hurn worked in excess of full-time, often over sixty (60) hours per week, without drawing a salary. Plaintiff Hurn did so in good faith and in reliance on ongoing assurances that his compensation, equity participation, and executive status would be formalized once the organizational structure, budgets, and capitalization plan were finalized.

27.     During this period and continuing forward, Plaintiff Hurn functioned as a senior executive across the majority of Defendants' enterprises.

28.     Among other responsibilities, he directed government-guaranteed lending strategies; helped craft and edit corporate communications and marketing; acted as a media spokesperson; appeared on regular "executives-only" update calls; and led or materially drove the following initiatives including: (a) the lender-services platform that became Phoenix; (b) secondary market sales and the associated premium income; (c) regulatory and government relations; (d) e-banking and fintech initiatives; (e) software and technological developments; (f) a branch-sale leaseback strategy; (g) a first-ever, enterprise-wide, thorough personnel evaluation; and (h) the concept and structuring of an SBA loan securitization.

29.     In this same window, and at Defendants' request, Plaintiffs also shouldered operational leadership for multiple strategic projects that CB&T and CBI either had not undertaken previously or had not been able to advance.  Those

8

projects include: (1) building out a national SBA lending channel; (2) positioning the institution for Preferred Lender Program (PLP) status with the U.S. Small Business Administration; (3) scaling up USDA lending capacity; and (4) professionalizing reporting, forecasting, and communications with regulatory agencies, investors, media, and the public at large.

30.     On April 1, 2024, in order to formally paper the relationship, Plaintiff Hurn (through his company,) and CBI executed an Independent Contractor and Consulting Agreement ("Consulting Agreement").

31.     The Consulting Agreement states that Plaintiffs would provide consulting services and centralized management services to CBI, including advising on strategic direction, operational efficiency, corporate governance, marketing, product development, revenue strategy, capital planning, and related executive functions.

32.     The Consulting Agreement provided compensation of thirty-one thousand two hundred fifty dollars ($31,250.00) per month beginning April 1, 2024, and confirmed that Plaintiffs would be exercising senior-level oversight in favor of CBI. The Consulting Agreement is governed by Georgia law and provides that disputes are subject to Georgia jurisdiction.

33.     By late 2024 and into 2025, Plaintiff Hurn was performing executive-level duties across CBI and was routinely treated internally as a top operating

executive, presenting to and interfacing with directors, regulatory bodies, counterparties, and strategic partners, as well as being the *de facto* leader of dozens of key staff.

34.    In addition to providing consulting services, Plaintiff Hurn personally capitalized the Defendants as well. In September 2024, at the insistence of Jeremy Gilpin, CBI's Chairman, and Steve Jefferies, CB&T's President and CEO, as well as CBI's President and CEO, Hurn provided eight hundred thousand dollars ($800,000) in financing to CBI, documented by a Promissory Note (the "Note") dated September 26, 2024.  The Note accrues interest at Prime plus one percent (1%) and matured on September 26, 2025.

35.    The Note was approved by the Board and the Board represented to Hurn that the Note could, at Hurn's election, be converted into eight hundred thousand (800,000) shares of CBI common stock at one dollar ($1.00) per share. This promised conversion right was part of the consideration for his leadership, reputation, and overall contributions made to CBI.

36.    Hurn asked CBI corporate counsel, Mark Lewis, to begin preparing the conversion documents starting in November 2024. Despite repeated promises and Hurn's requests, Defendant's counsel never delivered the promised conversion paperwork.

37. This delay and withholding of documentation deprived Hurn of the ability to elect that conversion and secure the equity stake the Defendants had promised.

38. In late November 2024, Defendants again sought capital from Hurn for the launch of what became Phoenix – the government-guaranteed lender-services platform that would originate, underwrite, process, close, sell and service SBA and USDA loans at scale.

39. At their request, Hurn invested one million two hundred thousand dollars ($1,200,000) for six hundred thousand (600,000) shares of CBI common stock valued at two dollars ($2.00) per share. That investment equated to roughly four and nine-tenths percent (4.9%) ownership in CBI. Plaintiffs' cash infusion, credibility, and leadership allowed Phoenix to launch in January 2025.

40. Had Hurn's Note been converted as promised, Hurn would have owned over ten percent (10%) of CBI, triggering a regulatory ownership filing. Upon information and belief, Defendants' delays were in part due to this reporting requirement, which they clandestinely sought to avoid.

41. As with Defendants' other enterprises, Phoenix was built around Plaintiffs' team, relationships, banking and capital markets model, and immediately became the operational and earnings engine for the CBI enterprise. As a result, Plaintiff Hurn was named President and CEO of Phoenix.

42.    In December 2024, Hurn was also appointed to the Board of Directors for CBI and was named President of CBI.  And by April 2025, in recognition of his significant contributions and leadership, Defendants further elevated Plaintiff Hurn to CEO of CBI, while he continued as President of CBI and President and CEO of Phoenix.

43.    By May 2025, Defendants elevated Hurn to Interim President of TFG—an entity apart from the Consulting Agreements which he had originally no intent to helm.– Plaintiff Hurn's management of TFG  brought leadership and management to the organization, while focusing on the improvement of its pipeline and sales prospects.

44.    At this point, Plaintiff Hurn was, in title and substance, the top operative executive for nearly the entire enterprise, with more reporting personnel than any other individual across Defendants' organizations.

45.    On April 16, 2025, Defendants and Plaintiffs executed an Amended and Restated Independent Contractor and Consulting Services Agreement (the "Amended Consulting Agreement").

46.    The Amended Consulting Agreement expressly replaced the April 1, 2024, Consulting Agreement. Under the Amended Consulting Agreement, Plaintiff Hurn was to provide services to the Contracting Defendants "filling the role of President and CEO."

47.     The Amended Consulting Agreement increased Plaintiffs' compensation to forty-five thousand dollars ($45,000.00) per month, effective April 16, 2025. The Agreement also provided an Annual Bonus with a target equal to twelve times the monthly consulting fee and tied the Annual Bonus to the Contracting Defendants' EBITDA as compared to the Board-approved budget. The performance calculation is shown below:

| **Annual Bonus** **(as % of Target)** | **EBITDA Result** **(x = Actual Results of Audited Financial Statements as Compared to Approved Budget)** |
|---|---|
| 0% | x < 75% |
| 50% | 75% < x < 100% |
| 100% | 100% < x < 125% |
| 150% | 125+% < x |

48.     Separately, Defendants represented that Plaintiffs would also be paid an additional annual performance budget equal to ten percent (10%) of Phoenix's net income, and later agreed to instead promise ten percent (10%) of CBI's net income as additional incentive for Plaintiffs taking over the leadership of TFG, in addition to the CBI and Phoenix entities. Defendants' corporate counsel confirmed that further formal written documentation of the bonus would be forthcoming between April and August of 2025. However, Defendants never delivered that formal written documentation.

49.     In addition to compensation, the Amended Consulting Agreement also materially changed termination mechanics. Whereas the 2024 Consulting Agreement allowed CBI to terminate on thirty (30) days' written notice without cause, the 2025 Amended Consulting Agreement required ninety (90) days' written notice for termination without cause.

50.     The Amended Consulting Agreement confirms that Plaintiff Hurn was functioning as the executive with responsibility to act as the Contracting Defendants' President and CEO, oversee financial performance, regulatory compliance, credit quality, capital planning, governance, marketing, human resources, risk oversight, and to serve as principal liaison to the Board of Directors. The Agreement's Exhibit A enumerates more than thirty essential duties, including: directing programs and services; overseeing credit quality and risk management; coordinating strategic planning; acting as official spokesperson in local, regional, statewide, and national issues; supervising senior management; and ensuring compliance with all applicable banking and regulatory requirements.

51.     On April 17, 2025, the CBI Board of Directors formally ratified Hurn's appointment as Chief Executive Officer of CBI and to the Board of Directors for CB&T.  In the few short months following Hurn's formal promotion to CEO, company financial results demonstrated a dramatic improvement over Defendants' historical financial performance.

52.     Prior to Plaintiffs' involvement, Defendants' enterprise lacked mature SBA and USDA lending infrastructure, lacked institutional credibility in the national government-guaranteed lending market, and had limited product offerings, capital market capabilities, and corporate governance discipline.

53.     By bringing in their highly experienced and effective team, Plaintiffs delivered to Defendants a turnkey national government-guaranteed lender-services engine, now capable of, including, but not limited to, origination, underwriting, closing, servicing, liquidation, secondary market sales, and capital markets relationships.

54.     In addition, the Board was provided extensive training in, among other areas, Anti-Money Laundering, Fair Lending, Unfair Deceptive, or Abusive Acts or Practices (UDAAP's), and SLFL Compliance Training. The Board also approved at least sixteen new corporate policies, including a new Code of Ethics and Employee Handbook. The adoption of these policies under Plaintiffs' leadership shows his efforts and success in establishing proper corporate governance.

55.     On or around August 15, 2025, Plaintiffs received a two-page letter from the USDA asking CBI to voluntarily agree to a suspension of CB&T's approved lender status. While CB&T was a subsidiary of CBI, Plaintiffs were not in charge of, nor a part of operations for, CB&T.

56.     The letter from the USDA came as a result of perceived delinquencies on CB&T's USDA loans, all tied to Gilpin as the originator.

57.     Plaintiff Hurn immediately took the letter to Gilpin, as Chairman of CBI's Board and now President and CEO of CB&T, who stated that the letter did not need to be shared with the Board at that time and that the matter could be handled without the Board.

58.     Despite CB&T not being under Plaintiffs' control, as President and CEO of CBI, Plaintiff Hurn, along with Gilpin, drafted a thirty-three (33) page response to the letter from the USDA. In addition, Hurn was scheduled to meet with the appropriate parties to correct the misconceptions on October 7, 2025, however, this meeting did not occur as a result of the government shutdown.

59.     Currently, CB&T potentially faces further regulatory penalties that could severely impact their ability to perform as Plaintiffs had intended when they built the Contracting Defendants.

60.     Under Plaintiffs' leadership, Defendants experienced a dramatic increase in scale, revenue, and institutional credibility, including that:

    a. Throughout 2025, CBI's performance reflected strong growth with consistent double digit percentage increases in cumulative income, including approximately thirty three percent (33%) increase from April to May, eighteen percent (18%) increase from May to June,

twenty four percent (24%) increase from June to July, and nineteen percent (19%) increase from July to August.

b. Within two years, CB&T's assets grew exponentially by one hundred seventy-three and six tenths' percent (173.6%), and the Call Report shows the bank was well-capitalized and profitable, with strong capital ratios and returns.

c. Between May and October of 2025, TFG reported hundreds of millions of dollars in its pipeline and stood to net millions of dollars if all of the loans in its pipeline closed.

d. Independent valuations from June 30, 2025, confirmed that Phoenix alone carried an enterprise value of over eighty-five million two hundred ninety thousand dollars ($85,290,000). That valuation confirms that Phoenix, which did not exist prior to Plaintiffs' arrival, and which was launched and led by Plaintiffs, has become a core enterprise asset for the Defendants.

61. Furthermore, through Plaintiffs' leadership, the CBI enterprises achieved many successes, including but not limited to: (a) achieving and renewing SBA Preferred Lender Program (PLP) status, a designation reserved for seasoned SBA lenders and held by only a small fraction of institutions nationwide; (b) launching an e-banking/fintech platform to facilitate depository account captures,

17

tax credit related products, and other lending products, along with originating and servicing government-guaranteed loans; (c) initiating a branch sale-leaseback strategy; (d) overseeing design and implementation of a custom SBA loan origination system in partnership with an outside vendor; and (e) helping structure a securitization of unguaranteed SBA loan portions – only the second such transaction of its kind.

62.    At this time, despite this growth and value creation made by Plaintiffs, the compensation, equity, and governance protections promised by Defendants were still not fully honored. Specifically, Defendants had still failed to: (a) finalize the paperwork for the Note conversion into equity; (b) pay Plaintiff Hurn for the nine-month period that he worked without salary from August 2023 through April 2024; or (c) pay the agreed Annual Bonus and the additional ten percent (10%) of CBI's net income bonus.

63.    Instead, in early October 2025, CBI's directors and senior leadership began discussing the removal of Plaintiffs.

64.    Upon information and belief, on or about October 6 or 7, 2025, CBI's board met and, without prior notice to Plaintiffs and outside the formal governance process, presumably determined that Plaintiffs should be pushed out.

65.     As a result, Plaintiffs—who still remained willing to work with CBI's directors to ensure a clean exit—attempted to negotiate an orderly separation framework.

66.     On October 7, 2025, Plaintiff Hurn received a phone call from Gilpin who confirmed that Hurn was to be terminated and to discuss the announcement of his termination. On the call, Hurn asked if he could personally let his team know that he would be leaving the Company, to which Gilpin assured Hurn that he could.

67.     In complete disregard for ongoing negotiations, CBI's Human Resources department, on October 9, 2025, circulated an "Organizational Change" email to all staff, containing a release drafted by Jeremy Gilpin ("Gilpin"), who now represented himself as President and CEO of CBI.

68.     In this release, Gilpin falsely stated that "Chris Hurn has resigned from his roles at Community Bankshares Inc., Thomas Financial Group, and Phoenix Lender Services" and that the transition comes as an address to "necessary corrective actions."

69.     This statement was false. Plaintiff Hurn had not resigned. No agreement had been executed pursuant to the ninety-day notice period as required under the Amended Consulting Agreement or otherwise. Instead, Gilpin framed Plaintiffs' departure as an immediate resignation tied to "corrective actions," thereby implying misconduct or deficiency by Plaintiffs and directly impugned

their professional reputation within the SBA and USA lending community, with industry partners, and with existing and prospective referral sources.

70.     Upon learning about the release, it was immediately brought up to CBI's counsel, James Stevens, who had been the counsel assisting in negotiations for the separation framework. Mr. Stevens claimed that the announcement needed to be made because, "Chris had already told his assistant, and she called to ask what would happen to her." This again, was false. Plaintiff Hurn did not have an assistant, a fact known by the Defendants.

71.     Furthermore, upon information and belief, following the false announcement that Plaintiff Hurn had resigned, Gilpen communicated to at least two (2) employees that Hurn had already signed a non-compete and non-solicitation agreement in an attempt to reassure them of his inability to compete and/or offer them future employment. This was, again, a false statement made by Gilpin. Plaintiffs had not signed any non-compete or non-solicitation agreement, and the operative 2025 Amended Consulting Agreement contained no non-compete or non-solicitation provisions.

72.     On October 21, 2025, while Plaintiffs were still engaged in discussions with Defendants regarding an orderly separation, Defendants – acting through counsel – sent an official "Termination of Agreement" letter purporting to

20

terminate the April 16, 2025, Amended Consulting Agreement, effective immediately.

73.    The Termination Letter claimed to expressly rescind the proposed separation framework that the parties had been negotiating and claimed that the Amended Consulting agreement was being terminated "for cause."

74.    The Termination Letter alleged that Plaintiff Hurn had breached Paragraphs 1, 2, and 12 of Exhibit A to the Amended Consulting Agreement, defining essential duties Hurn was responsible for as President and Chief Executive Officer.

75.    Despite this, Plaintiff Hurn has fully and faithfully performed each duty described in those paragraphs and Defendants' claims otherwise are demonstrably false.

76.    Notably, the Termination Letter is at odds with the October 9, 2025, Organizational Change communication to all Company employees.  The conflicting communications further demonstrate that Defendants' stated rationales were pretextual and manufactured after the fact to justify a predetermined removal. Plaintiffs at all times acted in the enterprise's best interest, consistent with the established reporting protocols.

77.    The Termination Letter's selective citation of three generic "essential duties" provisions, without identifying any specific factual act or omission,

demonstrates that the stated reasons for "cause" were a bad faith, post-hoc justification for a predetermined decision to remove Plaintiff Hurn without cause and to seize the value he has created.

78.    By attempting this end-run termination, Defendants acted in such a way to retain the enterprise, capital, and goodwill that Plaintiffs had created, while avoiding the financial obligations owed to them under the Amended Consulting Agreement, the Note, and equity holdings.

79.    Further, available facts demonstrate the falsity of Defendants' claims that Plaintiffs failed to maintain the Contracting Defendants in a safe and sound manner.  For example:

    a.    In the official Federal Financial Institutions Examination Council ("FFIEC") Call Report for CB&T dated September 30, 2025,[1] CB&T reported total assets of approximately two hundred seventy eight million one hundred seventy eight thousand dollars ($278,178,000), a Tier-1 Capital Ratio of ten and two hundred ninety-five thousandths percent (10.295%), total equity capital of seventeen million four hundred forty two thousand dollars ($17,442,000), a Return on Assets of one and eight tenths percent (1.8%) and a Return on Equity of

---

[1] Plaintiffs are aware that Defendants have recently restated certain of these Call Reports.

twenty eight and seven hundred thirty-five thousandths percent (28.735%). All such measures comfortably exceed well-capitalized and well-performing bank standards.

b. On November 4, 2025, less than two weeks after Defendants terminated Plaintiff Hurn and falsely announced that he had "resigned effective immediately," CBI issued a national press release that publicly celebrated the success of Phoenix, citing record-breaking performance and national rankings achieved entirely during Plaintiffs' tenure.   According to Defendants' own release, Phoenix facilitated more than three hundred twenty five million dollars ($325,000,000) in SBA and USDA loan closings during its first full fiscal year in operation (a time in which the CBI companies were firmly under Plaintiffs' leadership), including two hundred ten million dollars ($210,000,000) in SBA approvals, one hundred fifty six million eight hundred thousand dollars ($156,800,000) in funded SBA loans, and one hundred sixty eight million two hundred thousand dollars ($168,200,000) in USDA-guaranteed financings. The press release further stated that Phoenix achieved four million three hundred fifty thousand dollars ($4,350,000) in production per full-time employee, results described by Gilpin in the release as "exceeding every

23

expectation" and "one of the most successful inaugural performances in the history of government-guaranteed lending." Gilpin, in the press release, declared that "these results prove that Phoenix's innovative model works" and credited "a top-tier leadership group and experienced team" for the platform's unprecedented success. Phoenix projects facilitating between two hundred fifty million dollars ($250,000,000) and three hundred million dollars ($300,000,000) in new SBA and USDA loan production for fiscal year 2026, further strengthening and growing the serving division and is also expanding its Lender Service Provider partnerships to support additional banks across the country.

80.    Upon information and belief, after forcing Plaintiffs out, Defendants continue to benefit from (a) the lending platform; pipeline; personnel; referral, agency, media, political, and capital market relationships; and processes that Plaintiff built; (b) the revenue and profits streams from Phoenix and TFG; (c) the increased asset base, standing, and profitability of CB&T; (d) the goodwill, vendor relationships, technology, and regulatory standing that Plaintiffs had cultivated in the activities of Phoenix and TFG; and (e) the avoidance of paying Plaintiffs the significant compensation they are due.

24

81.     To date, Defendants have not repaid the eight hundred thousand dollars ($800,000) Note that matured September 26, 2025, nor have they honored the promised right to convert that Note into eight hundred thousand (800,000) shares at one dollar ($1.00) per share.

82.     To date, Defendants have not redeemed or repurchased Hurn's six hundred thousand (600,000) CBI common shares for their value, despite acknowledging in negotiations that such a redemption was part of the separation framework.

83.     To date, Defendants have not paid Plaintiffs the compensation due for (a) nine months of uncompensated work between August 2023 and April 2024; (b) contractual monthly compensation and bonuses through and including the ninety-day notice period required by the Amended Consulting Agreement; and (c) the agreed upon ten-percent (10%) net income of CBI as a performance bonus.

84.     To date, Defendants have not issued any corrective written communication to staff, regulators, counterparties, or industry partners retracting the false statement that "Chris Hurn has resigned effective immediately" for "necessary corrective actions."

85.     To date, Defendants have rejected all attempts by Plaintiffs to obtain the financial documentation—which is solely in Defendants' control—that would be needed to properly value the shares of stock for which Defendants denied Hurn

25

his conversion rights, as well as the determination and valuation of his actual ownership stake in the entities.

86.    Upon information and belief, Defendants' ongoing actions continue to degrade and devalue Plaintiffs' stock and ownership stake in the entities through at least, their continued mismanagement, regulatory compliance failures, and lack of operational transparency.

87.    Defendants' actions have caused Plaintiffs substantial harm, reputational damage, and continuing competitive injury. The assets, profits, revenue streams, goodwill and market position that Plaintiffs were instrumental in building are now being exploited by Defendants without compensation to Plaintiffs.

88.    The inconsistency between Defendants documented financial condition and their stated reasons for termination underscore that the "for-cause" justification was false, retaliatory, and designed solely to deprive Plaintiffs of the compensation, equity, and contractual rights earned. Plaintiffs therefore brings the following causes of action to redress Defendants' breaches and misconduct.

<u>COUNT I – BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>

**AGAINST CBI AND PHOENIX**

89.    The elements of a breach of contract claim in Georgia are (1) a valid contract; (2) Plaintiffs' performance as specified in the contact; (3) the Contracting

Defendants' failure to perform according to the contract; and (4) Plaintiffs suffered damages as a result of the Contracting Defendants' breach of the contract.

90.    Additionally, under common law in Georgia, every contract governed by Georgia law includes an implied covenant that the parties will act in good faith and deal fairly with one another in performing their rights and obligations under the contract, and to not act arbitrarily or capriciously.

91.    Plaintiffs and the Contracting Defendants entered into multiple binding written agreements, including but not limited to:

     a.  the Independent Contractor and Consulting Services Agreement dated April 1, 2024 between Plaintiffs and the Contracting Defendants; and

     b.  the Amended and Restated Independent Contractor and Consulting Services Agreement dated April 16, 2025 between Plaintiffs and the Contracting Defendants.

92.    Each of these agreements was supported by valid consideration and governed by Georgia law.

93.    Plaintiffs fully performed all material obligations under each of the respective contracts, including providing the executive, managerial, strategic, and operational services described in Exhibit A to the Amended Consulting Agreement, and fulfilling Hurn's duties as President and Chief Executive Officer of the CBI enterprises under the Consulting Agreements.

27

94. The Contracting Defendants breached the contracts in multiple ways, including but not limited to:

   a. Terminating the Amended Consulting Agreement without providing the ninety (90) days' written notice required for termination without cause;

   b. Purporting to terminate the Agreement "for cause" without an opportunity to cure or factual basis; and

   c. Failing to pay Plaintiffs the contractually promised monthly compensation for the ninety days as required under the Amended Consulting Agreement, the accrued bonus, and performance incentives.

95. The Contracting Defendants' wrongful "for-cause" termination further breached the express requirement that any cause must be grounded in willful misconduct, fraud, or specific enumerated acts, of which none occurred.

96. CBI violated the related covenant of good faith and fair dealing at least by:

   a. Manufacturing a pretextual "for-cause" termination to avoid paying Plaintiffs compensation and honoring their equity rights;

   b. Issuing false public statements that he had "resigned effective immediately" for "necessary corrective actions," thereby damaging

his reputation and attempting to conceal the Contracting Defendants' contractual breaches;

c. Using Plaintiffs' goodwill and work product to enrich themselves while denying him the agreed consideration; and

d. Otherwise acting in bad faith to deprive Plaintiffs of the benefit of his bargains.

97. The Contracting Defendants' conduct was willful, malicious, and in conscious disregard of Plaintiffs' contractual rights and professional reputation.

98. As a direct and proximate result of the Contracting Defendants' breaches, Plaintiffs have suffered substantial damages, including but not limited to significant reputational harm, unpaid compensation, bonuses, the value of Plaintiffs' equity, and consequential losses exceeding the jurisdictional minimum of this Court.

99. And the Contracting Defendants' ongoing actions continue to devalue and degrade Plaintiffs' equity and ownership rights in Defendants' enterprises.

## COUNT II – BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### AGAINST CBI

100. Plaintiff Hurn and CBI entered into a binding written agreement, in the form of the Promissory Note dated September 26, 2024.

101.    The Promissory Note was supported by valid consideration and governed by Georgia law.

102.    Hurn fully performed all material obligations under the agreement, including by advancing funds to the CBI.

103.    CBI breached the agreement in multiple ways, including but not limited to:

    a.  Failing to repay the eight hundred-thousand-dollar ($800,000) Note at or before maturity or to honor Hurn's right to convert that amount into eight hundred thousand (800,000) shares of CBI common stock; and

    b.  Failing to redeem or repurchase Hurn's six hundred thousand shares of CBI common stock at fair market value.

104.    CBI violated the related covenant of good faith and fair dealing at least by:

    a.  Delaying or withholding corporate documentation necessary for Hurn to determine his conversion and equity rights;

    b.  Using Hurn's goodwill and capital contributions to enrich themselves while denying him the agreed consideration; and

    c.  Otherwise acting in bad faith to deprive Hurn of the benefit of his bargains.

105.   CBI's conduct was willful, malicious, and in conscious disregard of Hurn's contractual rights and professional reputation.

106.   As a direct and proximate result of CBI's breaches and bad-faith conduct, Plaintiff Hurn has suffered substantial damages, including but not limited to significant reputational harm, the value of his equity and conversion rights, accrued interest under the Note, and consequential losses exceeding the jurisdictional minimum of this Court.

107.   Moreover, as Defendants have withheld financial information and supporting documentation necessary for Plaintiff Hurn to calculate aspects of his damages related to CBI's breach of the Promissory Note, and to protect his equity and creditor rights, Plaintiff Hurn seeks a formal accounting utilizing CBI's internal books and records in order to gain an accurate understanding of the financial transactions and values at issue.

108.   And the Contracting Defendants' ongoing actions continue to devalue and degrade Plaintiff Hurn's equity and ownership rights in Defendants' enterprises.

## COUNT III – FRAUDULENT INDUCEMENT

### AGAINST ALL DEFENDANTS

109.   Beginning in or around April 2025 and continuing through at least August 2025, Defendants, acting through their senior executives and directors,

including but not limited to Jeremy Gilpin, Mark Lewis, and Jeff Smith, made a series of intentional, material misrepresentations to Plaintiffs to induce them to (a) provide uncompensated executive services, and (b) provide additional executive services and management assistance above and beyond what was contemplated by the Consulting Agreements.

110.    Among the representations made by Defendants to Plaintiffs were that:

      a.  They would receive fair and documented compensation, including an additional ten-percent bonus relative to the net-income of CBI for Plaintiffs' managerial work and leadership oversight of TFG;

      b.  Defendants claimed an intent to finalize the paperwork and corporate approvals necessary to effectuate this in the normal course.

111.    At the time these representations were made, Defendants knew them to be false, or made them with reckless disregard for the truth. Defendants never intended to honor Plaintiffs' profit participation or long-term governance role. Instead, Defendants sought to capitalize on Plaintiffs' expertise, reputation, and capital to rescue and recapitalize their failing enterprise.

112.    Defendants also intentionally concealed and failed to disclose material facts necessary to make their statements not misleading, including: (a) that CBI's board leadership intended to remove Plaintiffs once the Phoenix platform and

related capital raise were complete; and (b) that Defendants would later claim "for-cause" termination to deprive them of their earned compensation and equity.

113.    Plaintiffs reasonably relied on Defendants' false representations and omissions. In reliance, they:

    a.  Left other business opportunities;

    b.  Devoted thousands of hours of uncompensated executive work to Defendants' operations; and

    c.  Brought substantial leadership and improved sales to the CBI enterprises, including TFG.

114.    Plaintiffs' reliance was justified because the representations were made directly by CBI's top officers and directors and were repeated in official correspondence by Defendants.

115.    Defendants' misrepresentations and omissions were made willfully and with the intent to deceive and to induce Plaintiffs to act to their detriment.

116.    Defendants' false assurances were material, intended to be relied upon, and did in fact induce Plaintiffs to act to their detriment.

117.    As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs sustained substantial damages, including but not limited to: (a) lost income and performance bonuses; (b) injury to professional reputation; and (c) consequential and punitive damages.

<u>COUNT IV – NEGLIGENT MISREPRESENTATION</u>

**AGAINST ALL DEFENDANTS**

118.   During the negotiations leading to Plaintiffs' managerial work and leadership oversight of TFG, Defendants made numerous representations concerning the Companies' intent to formalize Plaintiffs' compensation. These representations were made in letters, emails, proposals, and in-person meetings between at least May and August of 2025.

119.   Among other things, Defendants repeatedly represented that Plaintiffs would receive fair and documented compensation, including an additional ten-percent bonus relative to the net-income of CBI for Plaintiffs' managerial work and leadership oversight of TFG, in addition to the other two CBI entities they oversaw, and that this additional compensation would be documented and honored by Defendants.

120.   Defendants owed Plaintiffs a duty to exercise reasonable care and competence in communicating information on which they knew, or should have known, they would rely on in deciding to accept additional executive positions and managerial responsibilities of TFG.

121.   In making the foregoing representations, Defendants failed to exercise reasonable care. The information they provided was incomplete, inaccurate, and misleading.

122. Plaintiff Hurn reasonably relied upon Defendants' representations and omissions in agreeing to serve as interim President of TFG, leading the drive to improve its overall performance and sales, and in forgoing other professional opportunities.

123. As a direct and proximate result of Defendants' negligent misrepresentations and omissions, Plaintiffs have suffered financial and reputational damages, including the loss of unpaid compensation, and the benefit of the bargains Plaintiffs reasonably expected to receive.

### COUNT V – UNJUST ENRICHMENT

### AGAINTS ALL DEFENDANTS

124. Under Georgia law, a party may not retain the benefits of another's labor, services, or capital without paying fair and reasonable compensations when equity and good conscience require restitution.

125. Plaintiffs conferred substantial and measurable benefits upon Defendants, including but not limited to:

    a. Providing full executive leadership and management services across the CBI enterprise from mid-2023 through early October 2025.

    b. Developing and launching the Phoenix lender-services platform that was independently valued at over eighty-five million dollars ($85,000,000);

c.  Stabilizing CB&T's operations, increasing consolidated assets to nearly three hundred million dollars ($300,000,000), and creating the profitability reflected in the September 30, 2025, Call Report;

d.  Providing additional management and executive leadership for TFG, and overseeing a substantial improvement in its operations and sales; and

e.  Contributing personal capital totaling two million dollars ($2,000,000).

126.    Defendants knowingly accepted and retained the benefits of Plaintiffs' work, expertise, and capital, including the continued use of the Phoenix platform, personnel, systems, and goodwill, without compensating him based on the performance of all of the Defendant entities as promised.

127.    Defendants' retention of these benefits, without repayment of the Note, redemption of Plaintiffs' shares, payment of the agreed upon compensation and bonuses, and continued benefit of Plaintiffs' contributions, is inequitable and constitutes unjust enrichment.

128.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have been damaged in an amount equal to, at a minimum, the value of their services rendered, the capital contributions made, and the enterprise value created for Defendants.

36

## COUNT VI – QUANTUM MERUIT

### AGAINST ALL DEFENDANTS

129.    In addition to his written agreements with Defendants, Plaintiffs provided extensive professional and executive services for the benefit of Defendants between approximately August 2023 and October 2025.

130.    These services included, but were not limited to:

   a.  Designing, staffing, leading, and managing the Phoenix lender-service platform;

   b.  Effectively overseeing CB&T's SBA and USDA lending programs and agency regulatory compliance;

   c.  Overseeing and leading the consolidated operations across the CBI enterprise, including also serving as interim President for TFG;

   d.  Securing and maintaining regulatory agency confidence, enterprise profitability, and capital adequacy; and

   e.  Leading the strategic initiatives that increased Defendants' consolidated assets to nearly three hundred million dollars ($300,000,000) and generated sustained profitability.

131.    Plaintiffs performed these services at Defendants' express request or with their full knowledge, and Defendants accepted the benefits thereof, continuing

37

to use the infrastructure, personnel, relationships, and goodwill Plaintiffs developed.

132.    Defendants were aware or reasonably should have been aware that Plaintiffs expected to be compensated fairly for the reasonable value of these services.

133.    To date, Defendants have failed and refused to pay Plaintiffs for a substantial portion of their work, including approximately nine months of uncompensated service preceding the April 2024 Consulting Agreement, the balance of earned fees and bonuses—including the promised compensation based on the performance of all of the Defendant entities—and the building and continued success of Phoenix.

134.    The services rendered by Plaintiffs were valuable, measurable, and directly responsible for Defendants' financial success. The fair and reasonable value of those services substantially exceeds the amounts paid to date.

135.    Equity and good conscience require Defendants to compensate Plaintiffs for the reasonable value of the services Defendants accepted and continue to benefit from.

136.    As a direct and proximate result of Defendants' failure to pay for those services, Plaintiffs have suffered damages in an amount to be proven at trial.

COUNT VII – CONSTRUCTIVE TRUST

**AGAINST CBI AND PHOENIX**

137.    The Contracting Defendants, through their misconduct, have wrongfully retained and benefited from assets, property, and enterprise value created and financed by Plaintiffs, including but not limited to the Phoenix lender-service platform, related servicing and secondary market revenues, goodwill, and other intangible property.

138.    Plaintiffs contributed substantial capital, labor, and intellectual property to develop these assets, all of which were intended to benefit both Plaintiffs and the Contracting Defendants.  The Contracting Defendants' retention and use of those assets without compensation is inequitable.

139.    Equity therefore requires the imposition of a constructive trust over:

    a.  The Phoenix lender-service enterprise and all revenues, profits, and goodwill derived therefrom;

    b.  Any proceeds of Plaintiff Hurn's eight hundred thousand-dollar ($800,000) loan that were diverted to corporate or insider use; and

    c.  Any dividends, distributions, or redemptions attributable to Plaintiff Hurn's six hundred thousand (600,000) shares of CBI common stock.

140.    A constructive trust is necessary to prevent unjust enrichment and to ensure that the Contracting Defendants do not continue to profit from property and enterprise value that, in good conscience, belongs to Plaintiffs.

39

141.    Plaintiffs request that the Court impose such a constructive trust, require an accounting of all proceeds held in trust, and direct the transfer or disgorgement of those assets, revenues, and profits to Plaintiffs in an amount to be determined at trial.

## COUNT VIII – REQUEST FOR PUNITIVE DAMAGES UNDER COMMON LAW AND O.C.G.A. § 51-12-5.1

### AGAINST ALL DEFENDANTS

142.    The actions of Defendants against Plaintiffs establish willful misconduct, malice, fraud, wantonness, and/or oppression and an entire want of care, which demonstrate conscious indifference to the consequences of the Defendants' actions.

143.    Defendants set out with the specific intent to cause harm to Plaintiffs through, inter alia, their tortious conduct and fraud set forth herein. Punitive damages should be awarded to punish, penalize and deter Defendants from future tortious conduct directed at competitors.

144.    Absent Defendants' willful, malicious, fraudulent, wanton, and/or oppressive conduct, and an entire want of care, Plaintiffs would not have suffered the substantial harms described herein.  Under O.C.G.A. § 51-12-5.1(f) there is no limit to the amount which may be awarded as punitive damages against Defendants, all of which were active tortfeasors.

## PRAYER FOR RELIEF

40

**WHEREFORE**, having fully stated their claims, Plaintiffs, respectfully requests that this Court enter judgment in their favor against Defendants Community Bankshares, Inc., Community Bank & Trust – West Georgia, Phoenix Lender Services, LLC, and Thomas Financial Group, Inc., jointly and severally, and grant the following relief:

1.  Compensatory damages in an amount to be proven at trial, including but not limited to unpaid compensation, bonuses, and benefits owed under the Amended Consulting Agreement.

2.  Damages for Breach of the Promissory Note, including the eight hundred-thousand-dollar ($800,000) principal balance, all accrued interest, and the fair market value of the conversion rights wrongfully denied.

3.  Damages for the value of Plaintiff Hurn's equity, including the fair market value of the six hundred thousand (600,000) shares of CBI common stock, any related dividends or distributions, and all appreciation and profits derived therefrom.

4.  Consequential and Expectancy Damages resulting from Defendants' contractual breaches and wrongful termination.

5.  Restitution and Disgorgement of all amounts by which Defendants were unjustly enriched through Plaintiffs' capital, services, and enterprise-building efforts.

6. Quantum Meruit Recovery equal to the reasonable value of Plaintiffs' uncompensated services, including nine months of pre-contract work and the value created in Phoenix Lender Services, LLC.

7. Punitive Damages for Defendants' willful, wanton and malicious conduct, as authorized by Georgia law.

8. Attorneys' Fees and Expenses of Litigation pursuant to O.C.G.A. § 13-6-11 and all other applicable provisions of Georgia law.

9. Prejudgment and Post-Judgment Interest on all monetary awards as allowed by law;

10. The imposition of a Constructive Trust over the relevant CBI enterprise entities and all related assets, revenues, profits, and goodwill created through Plaintiffs' capital efforts, and an order requiring the accounting and transfer of such property to Plaintiff.

11. A full Accounting of Defendants' books and records from 2023 to present, including all transactions, revenues, and profits relevant to Plaintiffs' compensation, loan, and equity interests.

12. Preliminary and permanent injunctive relief prohibiting Defendants, their agents, and successors from:

   a.  Dissipating, transferring, or encumbering the assets or revenues of Phoenix Lender Services, LLC, or any successor entity pending adjudication of this matter;

   b.  Altering, concealing, or destroying corporate or financial records relevant to Plaintiffs' contractual, ownership, or compensation rights;

   c.  Issuing or publishing any statement representing that Plaintiff Hurn resigned or was terminated for cause; and

   d.  Engaging in any act that interferes with Plaintiffs' ongoing business or professional relationships.

13. An order that Defendants preserve all relevant records, maintain the status quo pending resolution of this action, and perform any other act necessary to protect Plaintiffs' interests and ensure the availability of equitable relief.

14. Such other and further relief, at law or in equity, as the Court deems just, proper, and necessary to fully compensate Plaintiffs and restore them to the position they would have held but for Defendants' misconduct.

## JURY TRIAL REQUEST

Plaintiffs request a trial by jury on all issues so triable.

Dated this 31st day of March, 2026.

**HERMAN JONES LLP**

*/s/ John C. Herman*

John C. Herman
  (Ga. Bar No. 348370)
Candace N. Smith
  (Ga. Bar No. 654910)
Carlton R. Jones
  (Ga. Bar No. 940540)

3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
csmith@hermanjones.com
cjones@hermanjones.com

**Of Counsel:**

**PINO LAW GROUP, PLLC**
Mathew Courtney, Esq.
  (admitted *pro hac vice*)
99 South New York Avenue
Winter Park, FL 32789
Telephone: (407) 425 – 7831
mathew@pinolawgroup.com

*Counsel for Plaintiff*

## VERIFICATION

I, Christopher G. Hurn, hereby verify that I am familiar with the allegations in the Verified Amended Complaint ("Amended Complaint"), and that I have authorized the filing of the Amended Complaint and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 31st day of March, 2026

DocuSigned by:

*Chris Hurn*

F77E50D312324FD...

Christopher G. Hurn

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By: /s/ *John C. Herman*
     John C. Herman
     Ga. Bar No. 348370
     jherman@hermanjones.com