## <u>EXHIBIT A</u>

**AMENDED AND RESTATED**
**INDEPENDENT CONTRACTOR AND CONSULTING SERVICE AGREEMENT**

This AMENDED AND RESTATED **INDEPENDENT CONTRACTOR AND CONSULTING SERVICE AGREEMENT** (the "Agreement") is entered into as of April 16, 2025 (the "Effective Date"), by and between Community Bankshares, Inc., a Georgia corporation ("CBI") and Phoenix Lender Services, LLC, a Georgia limited liability company ("PHX," collectively "the CBI companies" or the "Companies") and JulRei Enterprises LLC, a Puerto Rico limited liability company ("JulRei" or "Contractor") which is represented herein by Christopher G. Hurn ("Hurn") as the Contractor's sole Member and Manager. The Company and the Contractor are collectively referred to herein as the "Parties".

1. **ENGAGEMENT OF SERVICES**

Subject to the terms of this Agreement, the Contractor will provide to the Companies the services as described in this Agreement (the "Services") in favor of the Companies. The Contractor must exercise the highest degree of professionalism and utilize his expertise and creative talents in completing all Services. The Contractor will use his best and most diligent efforts and skills to complete the Services in a timely and professional manner consistent with industry standards and policies approved from time to time by the Companies. The Contractor represents that it has the qualifications, the experience and the ability to properly perform the Services. The Companies reserves the right to change or modify the scope of Services, at its discretion, from time to time.

2. **SERVICES PROVIDED BY CONTRACTOR**

   (a) **Consulting Services**

The Contractor will provide the services to the Companies filling the role of President and CEO. The specific services will be adjusted as necessary for the Contractor to fill this role and the initial roles are described on Exhibit A attached hereto.

   (b) **Centralized Management Services**

The Contractor may, to the extent required by the Companies, provide management and organizational planning services. The Contractor may also provide advice on general administrative matters, human resources and team optimization, corporate governance, public relations, budgeting and treasury activities, conducting strategic reviews of operations, and analyzing and projecting current and future capital needs, among other related services that are compatible with and required by other services that may be provided as described above.

3. **AMENDMENT AND TERM OF AGREEMENT**

The Parties previously entered into that certain Independent Contractor and Consulting Service Agreement dated as of April 1, 2024 (the "Prior Agreement"). This Agreement amends and restates in full the Prior Agreement, and the Parties agree that upon execution and delivery of this Agreement that the Prior Agreement is terminated and replaced in full by this Agreement. Unless terminated as provided herein, this Agreement will extend for a term of six (6) months ("Term") commencing on April 16, 2025 ("Effective Date"). Such Term shall automatically be renewed for an additional, consecutive, and unlimited 12-month terms unless the Parties terminate the Agreement in writing.

### 4.  TITLE AND AUTHORITY

Upon execution of the Agreement, Mr. Hurn shall act as the Companies' president & CEO.

### 5.  COMPENSATION

As compensation for its services, the Contractor shall receive a monthly consulting fee of $45,000.00 which shall be paid monthly in arrears beginning on April 30, 2025.  For the sake of clarity, the payment for April 2025 shall be a partial payment $22,500.00 (the payment for the first half of April 2025 shall be based on the Prior Agreement).

Additionally, the Contractor shall receive a bonus for each calendar year during this Agreement, (the "Annual Bonus").   The target amount of the Annual Bonus shall be equal to the Contractor's monthly consulting fee multiplied by 12.    The actual amount of the Annual Bonus shall be calculated based on the CBI's actual annual financial performance of EBITDA as compared to its annual budget as approved by the Board.  The performance calculation shall be as follows:

| Annual Bonus (as % of Target) | EBITDA Result (x = Actual Results of Audited Financial Statements as Compared to Approved Budget) |
|---|---|
| 0% | x < 75% |
| 50% | 75% < x < 100% |
| 100% | 100% < x < 125% |
| 150% | 125+% < x |

The bonus shall be paid within 60 days after the completion of the annual audit and its formal acceptance by the Board.

### 6.  EXPENSES

The Company shall reimburse the Contractor for any expenses and ordinary costs paid or incurred by the Contractor on behalf of the Companies.

### 7.  PLACE OF WORK

The Contractor shall render the Services primarily in Puerto Rico.

### 8.  TIME

The Contractor's days and hours of service shall generally be subject to the Contractor's discretion, provided that Contractor meets all objectives to the entire satisfaction of the Companies.

### 9.  RELATIONSHIP OF THE PARTIES

The Parties hereby expressly agree and acknowledge that it is not their intention to create between themselves a partnership, joint venture, fiduciary, employment or agency relationship for the purposes of this Agreement, or for any other purpose whatsoever.  As such, the Contractor shall not be able to bind the Company in any contract or agreement.



### 10. SERVICES PROVIDED BY AND FOR THE CONTRACTOR FROM PUERTO RICO

It is the Parties' express intent that the Contractor provide all services to the Companies from Puerto Rico. All services will be deemed provided by the Contractor from Puerto Rico for the benefit of the Companies and all monies generated from such services will be deemed to be earned by JulRei.

Any services provided by Hurn are deemed to be provided by Hurn in his capacity as the owner, manager, sole Member, and representative of JulRei, and consequently inure to the benefit of JulRei.

### 11. LIMITATION OF LIABILITY

Neither Contractor nor any of its employees, officers, managers, members, or agents (if any) shall be liable to the Companies for any errors or omissions with respect to services provided under this Agreement unless attributable to their willful misconduct or fraud.

### 12. INCOME AND PAYROLL TAXES

Payroll taxes, including federal, state and local taxes, and/or Puerto Rico taxes will not be withheld or paid by the Companies on behalf of the Contractor. Neither the Contractor nor any of its employees will be treated as employees of the Companies for federal, state and local, and/or Puerto Rico tax purposes with respect to the services performed under this Agreement.

The Contractor will be solely responsible for filing all returns and paying any income, social security or other tax levied upon or determined with respect to the payments made to Contractor pursuant to this Agreement.

The Companies will not be responsible for withholding income or other taxes from the payments made to Contractor.  The Contractor agrees to defend, hold harmless and indemnify the Companies for any claims for taxes, penalties, interest and costs associated with any non-payment of taxes imposed on compensation under this Agreement.

### 13. BENEFITS

The Contractor and its employees – if any – are, and throughout this Agreement shall be, independent contractors and not employees, partners or agents of the Companies. Thus, Contractor, its employees, agents, and/or service providers shall not be entitled to, nor shall they receive any benefit normally provided by the Companies to its employees such as, but not limited to, sick and vacation leave, retirement, health care, bonuses, and/or any other fringe benefits offered by the Companies to its US-based employees.

### 14. TERMINATION BY EITHER PARTY

(a)      **Termination by the Companies for Cause**. The Companies may terminate this Agreement for Cause at any time without prior notice to the Contractor; provided, however, that Contractor shall only be entitled to receive the unpaid Consideration as of the date of termination. For purposes of this Agreement, "Cause" shall mean  (1) a breach of Contractor's (i) covenants under this Agreement, or (ii) any code of conduct or ethics or similar policy adopted by the Companies and provided to Contractor, or (iii) Contractor's abandonment of its duties as a contractor of the Companies or the Contractor's negligence or misconduct in the performance of its role as a contractor of the Companies; (2) the conviction of the Contractor of a felony adversely affecting the ability of the Contractor to carry on its duties under this Agreement; (3) actions by Contractor that cause the Companies to violate a local or federal statute,



regulation or law of any jurisdiction (including Puerto Rico and any other foreign jurisdiction); (5) Contractor's misappropriation of the Companies' assets; and/or (6) the wrongful disclosure by the Contractor of the Companies' confidential information.

(b)      **Termination by the Companies without Cause**. The Companies may terminate this Agreement without Cause; provided, however, that the Companies provide Contractor ninety (90) days prior written notice.

(c)      **Termination by the Contractor**. Contractor shall have the right to terminate this Agreement by giving ninety (90) days prior written notice to the Companies pursuant to this Section 13. If Contractor notifies the Companies of its intention to terminate this Agreement, the Companies reserve the right to make termination effective at an earlier date than that informed by the Contractor, without any further liability or obligation. If Contractor terminates this Agreement before the completion of its Term, its right to the Consideration will terminate immediately on the effective day of termination.

(d)      In any event, the Parties will always make a good faith effort to resolve any dispute that may arise between them in an amicable manner and without the intervention of a court of justice.

## 15. <u>CONFIDENTIAL BUSINESS INFORMATION</u>

(a)      The Contractor acknowledges and agrees that the Companies may furnish or disclose to it and/or its employees Confidential Information.  As used in this Agreement, "Confidential Information" shall mean all nonpublic confidential or other proprietary information that is disclosed by the Companies to the Contractor and/or its employees  regarding the Companies and the Services to be rendered to it by Contractor, whether furnished before, on, or after the date of this Agreement, whether oral or written, tangible or intangible, identifying or not the information as confidential; or information that should be expected to be confidential; and in whatever form or medium provided. Confidential Information includes, but is not limited to: any and all documents, drawings, illustrations and verbally discussed information; information and content of unpublished works, strategies, operations, service processes, designs, notebook entries, procedures, methods of operation, formulas, data flow analyses, drawings, sketches, product specifications, schematics, discoveries, inventions, research and development, improvements, source code and object code, concepts, ideas, processes, know-how, documentation, patterns, parts lists, blueprints, devices, trade secrets, prototypes and models, technical data, software, inventions, techniques, developments, algorithms, and engineering information, and information relating to the Companies' internal operations, business, financial plans or strategies, including, but not limited to, customers, customer lists, markets, financial statements, projections, contracts, agreements, proposals, work orders, quotes, pricing, marketing, financial and other strategic internal business plans or information, directly or indirectly disclosed by the Companies and any of its owners, affiliates, directors, managers, officers, employees, or agents to Contractor or its employees whether in writing, through electronic transmission, orally, visually or through any other means.

(b)      Contractor agrees that the Contractor, its employees, and/or service providers will not use or disclose any Confidential Information to which either the Contractor or its employees are exposed or have had access to in the course of its external contractor relationship with the Companies, whether such Confidential Information belong to the Companies or to third parties, during Contractor's relationship with the Companies and for as long afterwards as the Confidential Information remains confidential, whether or not it is in written or tangible form, except as required and authorized during the performance of Contractor's duties. If Contractor or its employees or representatives are requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, Contractor will promptly notify the Companies of such request or requirement so that the Companies may seek to avoid or minimize the required disclosure

- 4 -

and/or to obtain an appropriate protective order or other appropriate relief to ensure that any Confidential Information so disclosed is maintained in confidence to the maximum extent possible by the agency or other person receiving the disclosure, or, in the discretion of the Companies, to waive compliance with the provisions of this Agreement. In any such case, Contractor will use its reasonable efforts, in cooperation with the Companies or otherwise, to avoid or minimize the required disclosure and/or to obtain such protective order or other relief.  If, in the absence of a protective order or the receipt of a waiver hereunder, Contractor or its employees or representatives are compelled to disclose the Confidential Information or else stand liable for contempt or suffer other censure or penalty, Contractor will disclose only so much of the Confidential Information to the person compelling disclosure as it believes in good faith based on advice of counsel is required by law. To the extent allowable under any applicable law, rule or order, Contractor shall give the Companies prior written notice of the Confidential Information it believes it is required to disclose.

(c)      Contractor agrees that it and/or its employees' disclosure of the Confidential Information will cause irreparable damage to the Companies and, in addition to all other remedies available at law or in equity, the Companies will have the right to seek equitable and injunctive relief and to recover the amount of damages (including reasonable attorneys' fees and expenses) incurred relating to that unauthorized use.  Contractor acknowledges and agrees that the Confidential Information may be used only for the purposes established herein. Contractor will be liable under this Agreement to the Companies for any use or disclosure in violation of this Section by Contractor and its employees, representatives and/or affiliates.

(d)      The obligations of Contractor under this Section shall survive the termination of this Agreement.

### 16. <u>WORK FOR HIRE</u>

Contractor agrees that all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, made or discovered by Contractor or its employees, solely or in collaboration with others, during the Term which relate in any manner to the Services being rendered to the Companies that Contractor or its employees may be directed to undertake, investigate or experiment with, or which Contractor or its employees may become associated with in work, investigation or experimentation in the line of business of the Companies in performing the Services hereunder shall be deemed to be either the Companies' "owned intellectual property" or a "work made for hire" (collectively, "Work"), and are the sole property of the Companies.

### 17. <u>MISCELLANEOUS</u>

(a)      This Agreement and the documents referred to herein constitute the entire agreement between the Parties relating to the subject matter hereof and supersede all prior written and oral agreements. representations, and understandings of the parties with respect to the subject matter hereof. No supplement, change order, modification, or amendment of this Agreement shall be binding unless executed in writing by both Parties. No waiver of any provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

(b)      The Contractor may not voluntarily or involuntarily assign or otherwise transfer, in whole or in part, this Agreement or any rights hereunder without the prior written consent of the Companies. Any and all attempted assignments, delegations, subcontracts, or other transfers without the Companies' prior written consent shall be void.

(c)      Each party mutually warrants to the other that it has full power and authority to enter into this Agreement and to perform its obligations hereunder, and that the entering into of this Agreement and the performance of its obligations does not violate, and will not be in conflict with, any provision of its Articles



of Incorporation, Bylaws, and/or other governing documents. or any contract or agreement with a third party.

(d)      Notwithstanding any other terms and conditions hereof, in the event that a Party is materially unable to perform any of its obligations hereunder because of severe weather. natural disasters, Acts of God, riots, wars, acts of terrorism, governmental action, and/or other event of *force majeure* beyond such party's control, then such party shall, upon written notice to the other Party thereof, be relieved from its performance of such obligations to the extent, and for the duration, that such performance is prevented by such events: provided that such Party shall at all times uses its best efforts to promptly resume such performance.

(e)      It is expressly agreed, understood, and reiterated herein that the Contractor is performing services under this Agreement as an independent contractor for the Companies.

(f)      This Agreement may be executed in counterparts, all of which together shall constitute a single original.  Facsimile or other electronically transmitted signatures shall be valid as original signatures.

### 18. <u>NOTICES</u>

All required notices and communications shall be in writing and shall be sent via electronic message.

### 19. <u>SEVERABILITY</u>

If any provision of this Agreement or the application thereof, to any person or circumstances is held to be invalid, prohibited, or unenforceable for any reason, this Agreement shall be ineffective only to the extent of such invalidity, and the remaining provisions of this Agreement shall continue to be given full force and effect as if such invalid provision had not been inserted. The Companies shall substitute the invalid or unenforceable provision with a suitable and equitable provision to carry out, as far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision. If any provision of this Agreement is contrary to, prohibited by or deemed invalid under applicable law and regulations of one jurisdiction, such provision shall not thereby be rendered invalid in any other jurisdiction. The Companies reserve its discretion to interpret any provision of this Agreement considered ambiguous.

### 20. <u>INTERPRETATION & GOVERNING LAW</u>

The subject headings of the sections of this Agreement are included for purposes of convenience only, and shall not affect the construction or interpretation of any of its provisions.

This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia (regardless of the laws that might otherwise govern under applicable principles of conflicts of laws), without regard to the principle of conflicts of laws.

### 21. <u>JURISDICTION</u>

In the event of any dispute arising hereunder, the Parties hereby agree to submit to the jurisdiction of the State of Georgia.

### 22. <u>ENTIRE AGREEMENT</u>

Each Party on behalf of itself acknowledges and agrees with the other Party that this Agreement constitutes the entire agreement and understanding between the Parties and supersedes any previous arrangement, understanding or agreement between them, which, if any, shall be deemed to have been terminated by



mutual consent.

**IN WITNESS WHEREOF**, the Parties hereto have each executed this Agreement which shall go into effect as of the Effective Date indicated above.

CONTRACTOR

JULREI ENTERPRISES LLC

By:_____

Name:    Chris Hurn

Title:    CBI — President

THE COMPANIES

COMMUNITY BANKSHARES, INC.

By:_____

Name:    Jeremy Gilpin

Title:    President and CEO


PHOENIX LENDER SERVICES, LLC.

By:_____

Name:    Jeremy Gilpin

Title:    President and CEO



Exhibit A

---

## 1. ESSENTIAL DUTIES

1. Oversees the direction and administration of programs, products, and services provided by the Companies, including the Companies' financial performance, credit quality, business development, operations, regulatory compliance, and risk management; ensures that all aspects of the Companies' activities operate in a safe and sound manner, and provides the highest level of customer relations and service.

2. Ensures that tasks, objectives, and goals designated and approved by the Companies' Board of Directors are fulfilled and properly executed as directed; reports directly to the Board of Directors as the highest ranking official of the Companies; keeps the Board of Directors fully informed on the conditions and operations of the Companies and the important factors influencing operations and decisions made by members of Senior Management; and acts as a staff liaison to the Board of Directors by scheduling meetings and participating as a member of the Board of Directors by attending all meetings.

3. Plans, formulates, and recommends for the approval of the Board of Directors policies and programs that will further the tasks, objectives and goals of the Companies; recommends annual program goals to the Board of Directors; ensures an ongoing evaluation system is in place related to such goals and that reports of progress are provided to the Board of Directors on a regular basis; and executes such contracts, grants and commitments as may be authorized by the Board of Directors or by established policies.

4. Defines and executes current and long-range strategic plans, budgets, goals, and objectives that result in positive growth in equity, profits, loans and deposits, return on assets, return on investments, quality and scope of financial services, culture and human resources, and service to the community in the best interest of shareholders, the Board of Directors, customers, employees, and the public.

5. Serves as chairperson of the Companies' Management Committee; coordinates the Companies' asset/liability management programs to facilitate the assessment and control of interest rate risk and ensures compliance with Companies' financial objectives; and participates on all other executive Companies committees as applicable and/or required, such as Loan Committee, Capital Committee, Human Resources Committee, Asset-Liability Committee, Audit Committee, Marketing Committee, and Technology Committee.

6. Supervises the Companies' executive management team that report to the position, including (as applicable), but not limited to, the Chief Operating Officer, Chief Financial Officer, Chief Credit Officer, Chief Compliance Officer, Chief Information Security Officer, Chief Information Technology Officer, Risk Management Officer, Community Reinvestment Act Officer, Human Resources Manager, Marketing Officer, and other members of Bank management.

8

7. Works closely with the Companies' Chief Credit Officers to ensure the overall quality of the Companies' lending portfolio and program; participates as a member of the Companies' Loan Committee; ensures loan policies are communicated and oversees programs to verify policy adherence; advises and mentors lending personnel regarding risk assessment and policy compliance; and reports credit risk and loan loss reserve to the Board of Directors.

8. Monitors the Companies' financial performance by working closely with the Chief Financial Officer; reviews Companies' balance sheets; compiles and reviews various monthly financials; develops and prepares annual operating budgets; analyzes budget variances and communicates these variances to members of management; and oversees the Companies' assets and liabilities, deposit and loan rates.

9. Ensures that the Companies implement and maintain effective processes for information technology risk management (ITRM), including those that relate to cybersecurity, and works closely with the Chief Information Technology Officer and Chief Information Security Officer to support the Companies' business strategy in line with its risk appetite assigned by the Board of Directors.

10. Engages in business development activities through a network of developed contacts; assists members of management in conducting existing and/or prospective customer calls; and communicates the Companies' vision and culture to members of management to instill and motivate assigned goals.

11. Ensures the development and pursuit of effective marketing strategies to create a strong brand image for the Companies by working closely with the Companies' Chief Marketing Officer, and acts as an official spokesperson for the Companies in local, regional, statewide, and national issues.

12. Works closely with the Companies' Chief Compliance Officer and Risk Management Officer to ensure the Companies' compliance with all applicable banking (and other) laws, rules and regulations, and assesses the effect of regulatory changes on overall Companies and especially Bank compliance and risk and ensures such matters are communicated to the Board of Directors on a timely basis.

13. Ensures the Companies' vision and culture are developed and then effectively communicated to management and all Companies' personnel; works closely with the Chief Operating Officer and Human Resources Manager to achieve current and long-term goals; ensures the Companies maintain an adequate and effective workforce of properly trained and informed personnel; and provides periodic feedback regarding performance goals and conducts annual performance reviews with members of management.

14. Plans, organizes, and directs programs and services, and evaluates results and recommends policies, procedures, and actions to achieve program goals.

15. Provides guidance on matters of program, publications, budget and legal responsibility.

9

16. Supervises the executive secretarial function, maintaining official minutes of Board of Directors or other official meetings; provides security for all files, legal and historic documents, mailing lists, and client files.

17. Maintains effective industry awareness by reading sufficient daily, weekly, and monthly publications to be properly informed and able to converse about pertinent economic, governmental, and community related matters.

18. Works closely with the Companies' Community Reinvestment Act Officer by representing the Companies in community, civic, and CRA functions.

19. Directs, monitors, and appraises the performance of all executive officers of the Companies and provides the necessary coordination between activities.

20. Responds to inquiries or refers inquiries to the appropriate department or person, and exhibits the necessary follow-through with customers and/or staff involved.

21. Provides supervision and support to all areas of the department where service or assistance is needed; oversees activities of assigned department personnel; and opens and closes the department.

22. Monitors staff in daily tasks, operations and quality control; ensures the organization of assigned areas of the department, coordinating available resources (e.g., staff, materials, etc.) for maximum results.

23. Consistently applies superior decision-making techniques pertaining to inquiries, approvals and requests as they apply to existing policies and procedures, keeping within assigned approval limits and using these instances as learning tools for employee development.

24. Assumes responsibility for special projects and gathers data and prepares reports for the Board of Directors, audits and other personnel.

25. Plays a positive role in the development and growth of assigned department staff through excellent communication skills, both verbal and written, along with strong delegation skills ensuring  a highly cross-trained staff.

26. Performs personnel actions including performance appraisals, disciplinary actions, and interviewing candidates for employment, and supervises the daily activities of the departments including, but not limited to, effective delegation of assignments, developing work schedules, and providing necessary training.

27. Processes, solves and answers complex customer transactions, problems or inquiries.

28. Assumes responsibility for various department functions in the absence of staff members or in overload situations.

10



29. Treats people with respect; keeps commitments; inspires the trust of others; works ethically and with integrity; upholds organizational values; and accepts responsibility for own actions.

30. Demonstrates knowledge of and adherence to Equal Employment Opportunity (EEO) policy; shows respect and sensitivity for cultural differences; educates others on the value of diversity; promotes a working environment free of harassment of any type; and builds a diverse workforce.

31. Assures compliance with all Companies' policies, procedures and processes, and all applicable state and federal banking laws, rules and regulations, and adheres to Bank Secrecy Act (BSA) responsibilities that are specific to the position.

32. Completes administrative tasks correctly and on time; supports the Companies' goals and values; and benefits the Companies through outside activities.

33. Performs the position safely, without endangering the health or safety to themselves or others and will be expected to report potentially unsafe conditions. The Contractor shall comply with occupational safety and health standards and all rules, regulations and orders issued pursuant to the OSHA Act of 1970, which are applicable to one's own actions and conduct.

---

## 2. ENVIRONMENT AND PHYSICAL ACTIVITY

Contractor is in a non-confined office type setting in which he is free to move about at will. The position includes driving a Companies or personal owned vehicle which includes exposure to the outside weather elements and moving mechanical parts. It may include some minor annoyances such as noise, odors, drafts, etc.

Contractor in the course of performing this position spends time writing, typing, speaking, listening, lifting (up to 50 pounds), driving, carrying, seeing (such as close, color and peripheral vision, depth perception and adjusted focus), sitting, pulling, walking, standing, squatting, kneeling and reaching.

Contractor for this position may operate any or all of the following: telephone, smart phone, copy and fax machines, adding machine (calculator), check protector, scanner and image systems, scanning equipment, encoder, money counter, credit card terminal, typewriter, computer terminal, laptop computer, personal computer, tablet, printers, or other equipment as directed.

The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job.

The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job.

Reasonable accommodations may be made to enable individuals with disabilities to perform the



essential functions.

---

### 3. MENTAL DEMANDS

Contractor in this position must be able to read documents or instruments, detailed work, problem solving, customer contact, reasoning, math, language, presentations, verbal and written communication, analytical reasoning, stress, multiple concurrent tasks, and constant interruptions.

12